United States District Court
Southern District of Texas
FILED

MAY 0 3 2010

David J. Bradley, Clerk of Court

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | **BANKRUPTCY CASE NO.** |
| | § | |
| **TEXAS CLASSIC BUILDERS, LP** | § | **09-38472-H4-11** |
| **DEBTOR** | § | **Chapter 11** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DEBTOR'S DISCLOSURE STATEMENT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COMES NOW, TEXAS CLASSIC BUILDERS, LP., the Debtor-in-Possession, herein, and files this its Disclosure Statement pursuant to the provisions of Section 1125 of Title 11 of the United States Code.

## I.
## INTRODUCTION

"Plan" means the Chapter 11 Plan Proposed by the Debtor as well as any subsequent amendments or modifications. Information contained in this disclosure statement summarizes the Plan and should not be solely relied upon for voting purposes. Creditors and Interest Holders are urged to read the Plan carefully and are further urged to consult with their counsel in order to understand the Plan fully. The Plan is a legally binding document as in based on complex legal and financial considerations.

**IN THE OPINION OF THE DEBTOR, THE TREATMENT OF CREDITORS AND THE INTEREST HOLDERS UNDER THE PLAN PROVIDES A GREATER CHANCE OF RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES, UNDER THE CIRCUMSTANCES, FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN WOULD BE IN THE BEST INTEREST OF CREDITORS, AND RECOMMENDS ACCEPTANCE OF THE PLAN.**

**1.01  REPRESENTATIONS**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED SOLELY FOR THE BENEFIT OF CREDITORS AND INTEREST HOLDERS OF THE DEBTOR. NO REPRESENTATIONS CONCERNING THE PLAN ARE AUTHORIZED OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE**

1

STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENT THAT IS NOT
CONTAINED HEREIN SHOULD BE REPORTED TO THE ATTORNEYS FOR
THE DEBTOR, WHO WILL INFORM THE COURT, WHICH MAY TAKE SUCH
ACTION AS IT DEEMS APPROPRIATE.

THE PLAN PROPONENT DOES NOT WARRANT OR REPRESENT
THAT THE INFORMATION CONTAINED HEREIN IS CORRECT,
ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.  THE
FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE
STATEMENT HAS BEEN OBTAINED FROM THE RECORDS OF THE
DEBTOR, UNLESS SPECIFICALLY STTED TO BE FROM OTHER SOURCES.

THIS STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.
THE PLAN THAT ACCOMPANIES THIS DISCLOSURE STATEMENT IS AN
INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND EACH
CREDITOR AND INTEREST HOLDER IS URGED TO REVIEW THE PLAN.

THE PLAN PROPONENT MAKES NO REPRESENTATIONS WITH
RESPECT TO THE EFFECTS OF TAXATION (STATE OR FEDERAL) ON THE
CREDITORS WITH RESPECT TO THE TREATMENT OF THEIR CLAIMS
UNDER THE PLAN, AND NO SUCH REPRESENTATIONS ARE AUTHORIZED.
ANY TAX INFORMATION CONTAINED HEREIN IS MADE FOR
INFORMATION PURPOSES ONLY.  PARTIES-IN-INTEREST ARE URGED TO
SEEK THE ADVICE OF THEIR OWN PROFESSIONAL ADVISORS SHOULD
THEY HAVE ANY QUESTIONS WITH RESPECT TO ANY TAXATION ISSUES.

THE CONFIRMATION OF THE PLAN WILL DISCHARGE THE
DEBTOR FROM ALL DISCHARGEABLE PRE-FILING DEBTS BY VIRTUE OF
THE ORDER OF CONFIRMATION OR SECTION 1141(d) OF THE
BANKRUPTCY CODE.  IN ADDITION, OTHER RIGHTS OF CREDITORS ARE
ALTERED BY THE PLAN. CONFIRMATION MAKES THE PLAN BINDING
UPON ALL CREDITORS AND OTHER PARTIES-IN-INTEREST,
REGARDLESS OF WHETHER OR NOT THEY HAVE ACCEPTED THE PLAN.

ALL INITIALLLY CAPITALIZED WORDS USED IN THIS DISCLOSURE
STATEMENT HAVE THE SAME DEFINITIONS SET OUT IN ARTICLE I OF
THE PLAN.

**1.02 Source of Information and Accounting Method**.  The financial information
contained in this Disclosure Statement was compiled primarily form information provided
from the accounting and business records of the Debtor.  Accounting is on an accrual
basis in accordance with generally accepted accounting principals.  The Debtor's books
are maintained by Jim Hsieh, Certified Public Accountant.  Tax and other reporting
documentation are prepared by Jim Hsieh Certified Public Accountant.

In preparation of this Disclosure Statement of this Disclosure Statement,
Debtor investigated the conditions of the Debtor's book and records and believes that the
financial condition of the business is accurately reflected in this Disclosure Statement.

Other than as disclosed herein, the Debtor's books have not been audited by an independent public accountant. No absolute representations can be made as to the accuracy of the Debtor's records.

**1.03 Explanation of Chapter 11.**  Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Upon filing of a Chapter petition, Section 362 of the Bankruptcy Code provides for a temporary automatic stay of all attempts to collect claims that arose prior to the Filing Date, or otherwise to interfere with the Debtor's property or business, in order to permit the Debtor to attempt to reorganize.

Formulation of a Plan of Reorganization is the primary purpose of a Chapter 11 Reorganization Case.  A Plan of Reorganization sets forth the means for satisfying the holders of claims against, and interest in, a debtor.  Confirmation of a Chapter 11 Plan of Reorganization requires that either (i) all classes of claims and interest entitled to vote to accept the plan or (ii) that the plan be accepted by "insiders" within the meaning of the Bankruptcy Code and that the plan be confirmed as to each objecting class pursuant to 1129(b) of the bankruptcy code (the so called "cramdown")provisions.  In addition to the acceptance requirements, Section 1129 of the Bankruptcy code contains additional criteria that must be satisfied before a Bankruptcy Court may confirm a Plan of Reorganization. See "Confirmation Procedures and Standards."

Confirmation of the Plan under Chapter 11 will relieve the Debtor of liability for any and all of the Debtor's pre-confirmation debts except as provided in the Plan, the Confirmation Order, or Section 1141(d) of the Bankruptcy Code.  Confirmation makes the plan binding upon the Debtor and all Creditors, whether or not they have accepted the Plan.

**1.04 Procedure for Filing Proofs of Claim.**  The plan provides that Claims will be recognized only if evidenced by a filed proof of claim that is allowed by the Court, or if the Claim appears on the Debtor's schedules filed with the Court and Such claim is not listed as disputed, contingent or unliquidated.  In addition, the Bankruptcy Code permits the Debtor to ask the Court to reject unexpired leases and executory contracts.  The Plan provides that the party to any such lease or contract which is rejected may file a proof of claim for damages no later than thirty days after the entry of the Order authorizing rejection of the lease or contract.  Any party-in-interest may object to any claim. However, an unrecognized claim may be subsequently allowed and ordered paid by the Court.  Debtor's schedules may be reviewed in the Office of the Clerk of the Bankruptcy Court during regular business hours.

**1.05 Voting.**  In submitting this Disclosure Statement, The Plan Proponent is not seeking the acceptance of the Plan by the Creditors in Classes which are unimpaired by the Plan.  Unimpaired Creditors are not entitled to vote on the Plan.  Members of the Classes which hold impaired claims are entitled to vote to accept or reject the Plan.  If any Class elects to reject the Plan, Claims in that Class may be treated according to the cramdown provisions of section 1129(b) of the Bankruptcy code.  See "Introduction- 1.03 Explanation of Chapter 11 and "Confirmation Procedures and Standards-Cram-down".

**1.06 Classes Impaired Under the Plan**.  All classes under the Plan, except Class 1 are impaired and are eligible to vote to accept or reject the Plan subject to the limitation set forth in the Plan.

## II.
## THE CHAPTER 11 DEBTOR

**2.01 The Plan Proponent**.  This Plan is proposed by Texas Classic Builder, LP, the Debtor herein.  The Debtor believes that the Plan proposed is in the best interest of the creditors.  It should be noted that the owner's interest in the Debtor as of the Filing Date may be diluted and/or required to extend equity funding in order to retain their interests.

### 2.02 Background of Events Leading to Chapter 11 Filing.

**Background:**  Texas Classic Builders, LP is a limited partnership created under the laws of the State of Texas on or about July 12, 2004 pursuant to that certain Certificate of Limited Partnership. The general partner is Tannerhall, LLC, a Texas limited liability company created under the laws of the State of Texas on July 12, 2004.  The limited partners are its President, Darren Hall and Secretary, Rochelle Hall.  The Debtor was created for the purpose of purchasing, developing and selling real property in the custom residential home market.

**Bankruptcy Filing**.  Starting in late 2008 ,the United States economy began to decline.  Simultaneously, the Debtor had several homes in various stages of construction, the majority of these homes were under contract with clients as "custom" builds. Due to the economic situation, many of the clients could no longer obtain the funds or financing with which to consummate their purchase with the Debtor.  This resulted in the Debtor holding a large number of "inventory" homes and subjected the Debtor to economic reparations created by the unexpected loss of revenue and unanticipated expense relating to the custom construction it was now obligated to. As the economy continued to worsen throughout 2009, the Debtor's primary source of cash flow from the sales of homes, was being rapidly depleted as many of the Debtor's primary lenders began to use cross-collateralization methods to seize funds at the closing of homes in order to comply with sanctions that were being imposed on the lenders by Bank Regulators. The result of the cross-collateralization forced the Debtor to seek other sources of capital.  In the fall of 2009, a significant secured creditor, First Community Bank began to call all of their construction loan notes, due in full, upon their maturity.  The Debtor had six (6) real estate notes with First Community Bank, comprised of  two (2) completed homes with substantial amounts of equity, two (2) acreage estate lots and one incomplete home.  Due to the fact that there was such a large equity cushion in place, First Community waited until all of the notes reached maturity and then accelerated the notes with the intention of cross-collateralizing all of the notes and foreclosing on all of the properties at once.  The Debtor had negotiated a *written* agreement with First Community Bank to accept 100% pay-off on four (4) of the six (6) notes, with an agreement to re-new the two remaining notes whose terms stipulated six (6) months worth of forward interest carry on the renewed notes.  The Debtor had secured the necessary funds with a private investor and had secured all parties agreement and had the funds in place to transact the final negotiations prior to the scheduled foreclosure sale that First Community Bank had posted to take place on November 3, 2009 at 10:00 a.m..  On November 3, 2009 at 9:00 a.m. First

Community Bank notified the Debtor of First Community Bank's intention to reject the agreement and to go forward with the intended Foreclosure sale. The Debtor immediately filed for Chapter 11 bankruptcy relief to prevent the seizure of its properties and protect the assets and their equity for the benefit of the Estate and the unsecured creditors.

**2.03 Debtor's Liabilities**. At the Debtor entered into the Bankruptcy, it owed taxing authorities and various unsecured debts. The Debtor recognized debts as follows at the time of filing the petition:

| | |
|---|---|
| Priority Tax Debts | $13,457.08 |
| Secured Debts | $5,627,372.00 |
| M&M Secured Debts | $ 532,388.51 |
| Unsecured Debts | $1,030,926.70 |

**2.04 Status of the Debtor's Assets**. The Primary assets of the Debtor on the date of the bankruptcy filing were seven completed custom homes, three unfinished custom homes, three unimproved lots and two motor vehicles. As of May 2, 2010, the Debtor has sold and closed on two of the custom homes which were in its inventory on the date the bankruptcy was filed. Attached hereto and incorporated herein as Exhibit "A" is the accounting by the Debtor of all pre and post-petition transaction(s) regarding the building and sale of the Debtor's custom homes including but not limited to:

1.      The amount of the proceeds of sale from each of the houses that Debtor has sold during this case; (A-1)

2.      The amount of each payment made to pay the secured claims on each of the houses the Debtor has sold during this case; (A-2)

3.      The amount of brokerage and/or realtor fees and commissions, and closing costs paid on each of the houses that Debtor has sold during this case; (A-3)

4.      The net proceeds of sale-after deduction of the amounts set forth in subparagraphs 2 and 3 above-that were generated from each of the houses that Debtor has sold during this case; and the location of such net proceeds; (A-4)

5.      The amount of funds that Debtor has borrowed during this case, the identity of the lender in regard to any such borrowed funds, and the security for each such loan; (A-5)

6.      The amount of each pre- or post-petition trade or mechanics/materialmen's lien creditor claim incurred during the pendency of this case, the identity of the holder of each such claim, and the house on which each such claim was incurred; (A-6) and

7.      The amount of each pre- or post-petition trade or mechanic's/materialmen's lien creditor claim paid during the pendency of this case, the date of such payment, the identity of such holder of each such claim, and the home on which each such claim was incurred (A-7).

**2.05 Anticipated Future Management of Debtor**. The Debtor's Plan of Reorganization calls for the Debtor to continue the marketing and sale of the Debtor's Estate, which the Debtor believes will have sufficient equity to pay all secured and unsecured creditors at an amount substantially above that which would be received under a total liquidation of the estate. Debtor's President, Darren Hall and Secretary, Rochelle Hall will continue in their current positions and will oversee the marketing and sale of the Debtor's assets. Mr. Hall will be responsible for making distributions to the Debtor's creditors as provided in this Plan as assets are sold and proceeds are received by the estate. Officers will be paid a salary from the Debtor post-confirmation until all assets have been liquidated and proceeds distributed to creditors. Debtor's intend to accept new contracts for build when the reorganization is complete.

Therefore, the anticipated future management of Debtor is as follows:

**Darren Hall, President**

Compensation- Annual compensation of $75.000.00. Mr. Hall has worked for the Debtor during the pendency of this case and anticipates continuing his employment and overseeing the distributions to the creditors as well as supervising ongoing construction required for completion of sales.

**Rochelle Hall, Secretary**

Compensation- Annual compensation of $75.000.00. Ms. Hall has worked for the Debtor during the pendency of this case and anticipates continuing her employment and overseeing the marketing of the properties of the Estate as well as securing new sales for the reorganized Estate.

## III.
## SUMMARY OF THE PLAN

The following is a brief summary of certain provisions of the proposed Plan of Reorganization provided to assure that the creditors affected by the Plan understand its provisions. This summary should not be considered a solicitation for acceptance of that Plan. Additionally, creditors should not rely on this summary to decide whether or not to vote in favor of or against the Plan, but are expressly referred to the Plan itself since it contains many provisions which will not be summarized herein.

The Plan proposes that the Debtor continue business operations and a payment of claims from proceeds from the sale of property in order of priority as provided herein.

**3.01 Classification and Treatment of Creditors**. The Debtor's Plan of Reorganization will provide for classification of creditors in accordance with the United States Bankruptcy Code.[1]

---

[1] The Debtor reserves the right to dispute all of the claims listed in the Disclosure Statement. Debtor's listing of estimated claim amounts is for informational purposes only and are not binding on the Debtor in

**Class 1-Administrative Expenses**.  Class I is unimpaired.  Class 1 Claims entitled to priority by Section 507(a)(1) of the Bankruptcy Code.  All claims in this class shall be paid in cash and in full when such claims are allowed and approved by final order of the Bankruptcy Court.  If there are insufficient funds to pay all administrative claims in full, they shall be paid on a pro-rata basis.  The Reorganized Debtor shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. §1930(a)(6).  After confirmation, the Reorganized Debtor shall file with the Court and serve on the U.S. Trustee a quarterly financial report for each quarter (or portion thereof) the case remains open in a format prescribed by the United States Trustee and provided to the Debtor by the United States Trustee.  Attached and Exhibit "B" is a list of holders of Undsiputed Administrative Expense claims.  Undisputed Administrative Expense claims are approximately $20,777.00.

**Class 2-Priority Claims**.  Class 2 is impaired. Class 2 claims of the Internal Revenue Service and the State Comptroller, will be paid in full within 30 days after the Effective Date.  In the event there are insufficient funds on hand to satisfy the claims of the Internal Revenue Service, those claims will be paid after the Class 1 Claims have been paid in full.

| Kind of Tax | Tax Period | Date Tax Assessed | Tax Due |
|---|---|---|---|
| WT-FICA | 03/31/2009 | 06/29/2009 | $2158.84 |
| WT-FICA | 06/30/2009 | Per Return | 6,757.56 |
| WT-FICA | 09/30/2009 | Per Return | 4,540.69 |
| | | Total | $13,457.08 |
| | | | (Unsecured) |

Each holder of a secured ad valorem tax claim will be paid in full as to that specific property's ad valorem taxes upon the sale of the property by the Debtor.  As to any and all real property that is or may be surrendered by the Debtor during the course of this Chapter 11 case, then said ad valorem taxes associated as with any and all encumbrances, with that real property shall be the sole obligation of the Secured Creditor to which the property has been surrendered to.

**Class 3-Allowed Secured Claims on Personal Property Owned by the Debtor**

Class 3 is impaired and consists of the Secured Claims on the vehicles owned by the Debtor.

a.     The Allowed Secured Claim of Infiniti Financial concerning the 2006 Infiniti QX56 (Vehicle).  As provided in the Agreed Order Conditioning Automatic Stay-Docket #22 and Amended Order Conditioning Automatic Stay Docket #34-

1. Parties have agreed that the automatic stay shall remain in place pursuant to all terms of the Agreed Order being met in paragraphs 1-3 of the Agreed Order.

future claim objection proceedings.  The listed claim amounts are either from filed proofs of claim or Debtor's estimate of the claim as reflected in the Debtor's Schedules.

    2.   The automatic stay remains in effect until (i) there is a Final Default under this order; (ii) this case is dismissed; or (iii) the Debtor receives its bankruptcy discharge.

  b.      The Allowed Secured Claim of JP Morgan Chase concerning the 2008 Range Rover (Vehicle).  As provided in the Agreed Order Conditioning Automatic Stay-Docket #35

    1.   Parties have agreed that the automatic stay shall remain in place pursuant to all terms of the Agreed Order being met in paragraphs 1-3 of the Agreed Order.

    2.   Parties have agreed that the terms of  the automatic stay are binding and valid until confirmation of Debtor's Chapter 11 Plan, after which time the Automatic Stay terminates and each party shall be bound by the terms of the original contract.

### Class 4 –Secured Claim of Amegy Mortgage Company,L.L.C.

Impaired-    3515 West Elm Ct.- Westcreek Subdivision

The Debtor shall retain its interest in the property located at 3515 West Elm Ct. Richmond, Texas 77406 as identified in the amended Schedule A- Real Property, for  a period of 6 months after the Effective Date with the intent to market and sell said property with a real estate broker. Upon the expiration of the 6 month period and the failure by the Debtor to contract or sell the property, the Debtor shall surrender and abandon to Amegy Bank any and all interests in full and final satisfaction of Amegy Bank's claim in the property as identified in the Amended Schedule D- Creditors Holding Secured Claims. Debtor agrees to pay post-petition interest through the sale of the property, at note rate of 6%, from the date of filing of it's petition (November 3, 2009) through the date of the confirmation of the plan or through the date of any allowed sale whichever event occurs sooner. Any ad valorem taxes, if any, shall be paid upon the sale of the property by the Debtor.  Debtor agrees to maintain insurance coverage on the property, maintain the utilities, property maintenance, lawn and yard maintenance through the date of  sale. Debtor will also market the property with specialty advertising materials furnished at the Debtor's expense.

3615 Stonecrest Ct.- Westcreek Subdivision

The Debtor sold the property located at 3615 Stonecrest Ct., via a motion to sell, during the administration of the Chapter 11 case, said loan associated with the property has been paid pursuant to the agreed court order with Amegy Bank.

8

2415 Creektrail Ln.- Westcreek Subdivision

The Debtor sold the property located at 2415 Creektrail Ln., via a motion to sell, during the administration of the Chapter 11 case, said loan associated with the property has been paid pursuant to the agreed court order with Amegy Bank.

**Class 5- Secured Claim of Tradition Bank.**

Impaired- 3807 Tierra Amarilla- Lakes of Mission Grove Subdivision

The Debtor shall retain its interest in the property located at 3807 Tierra Amarilla as identified in the Amended Schedule A- Real Property, for a period of 6 months after the Effective Date with the intent to market and sell said property with a real estate broker. Upon the expiration of the 6 month period and the failure by the Debtor to contract or sell the property, the Debtor shall surrender and abandon to Tradition Bank any and all interests in full and final satisfaction of Tradition Bank's claim in the property as identified in the Amended Schedule D- Creditor's Holding Secured Claims. Debtor agrees to pay post-petition interest through the sale of the property, at note rate of 6% from the date of the filing of its petition (November 3, 2009) through the date of the confirmation of the plan or through the date of any allowed sale whichever event occurs sooner. Any ad valorem taxes, if any, shall be paid upon the sale of the property by the Debtor. Debtor agrees to maintain insurance coverage on the property, maintain all utilities and maintain lawn and property through the date of sale. The Debtor will also provide at its expense, specialty advertising materials furnished at the Debtor's expense.

8402 Silent Cedar Circle

(Vacant lot)- Whispering Oaks Subdivision

The Debtor shall retain its interest in the property located at 8402 Silent Cedar Circle as identified in the Amended Scheduled A- Real Property, for a period of 6 months after the Effective Date with the intent to market and sell said property with a real estate broker. Upon the expiration of the 6 month period and the failure by the Debtor to contract or sell the property, the Debtor shall surrender and abandon to Tradition Bank any and all interests in full and final satisfaction of Tradition Bank's claim in the property as identified in the Amended Schedule D- Creditors Holding Secured Claims. Debtor agrees to pay post-petition interest through the sale of the property, at note rate of 6% from the date of the filing of its petition (November 3, 2009) through the date of the confirmation of the Plan or date of sale of said property. Ad valorem taxes if any, will be paid upon the sale of the property by the Debtor. Debtor agrees to maintain the property through the date of sale.

**Class 6 -Secured Claim of Founders Bank.**

Impaired-  8410 Silent Cedar Circle- Whispering Oaks Subdivision

The Debtor shall retain its interest in the property located at 8410 Silent Cedar Circle, as identified in the Amended Schedule A- Real Property, for a period of 6 months

after the Effective Date with the intent to market and sell said property with a real estate broker. Upon the expiration of the 6 month period and the failure by the Debtor to contract and sell the property, the Debtor shall surrender and abandon to Founders Bank any and all interests in full and final satisfaction of Founders Bank's claim in the property as identified in the Amended Schedule D- Creditors Holding Secured Claims. Debtor agrees to pay post-petition interest through the sale of the property, at note rate of 6%, from the date of the filing of its petition (November 3, 2009) through confirmation of the Plan or date of sale of said property, whichever event occurs sooner. Ad valorem taxes if any, will be paid by the Debtor upon sale of said property. Debtor agrees to maintain insurance coverage on the property, maintain all utilities and maintain the lawn and property. A marketing report detailing any and all activity from potential clients, will be provided to Founders Bank on a monthly basis by the Debtor.


      502 Leaning Oak- Whispering Oaks Subdivision

      The Debtor shall retain its interest in the property located at 502 Leaning Oak as identified in the Amended Schedule A- Real Property, for a period of 6 months after the Effective Date with the intent to market and sell said property with a real estate broker. Upon the expiration of the 6 month period and the failure by the Debtor to contract or sell the property, the Debtor shall surrender and abandon to Founders Bank any and all interests in full and final satisfaction of Founders Bank's claim in the property as identified in the Amended Schedule D- Creditors Holding Secured Claims. Debtor agrees to pay post-petition interest through the sale of said property, at a note rate of 6%, from the date of the filing of its petition (November 3, 2009) through confirmation of the Plan or date of sale of said property, whichever event occurs sooner. Debtor agrees to maintain insurance coverage on the property, maintain all utilities and maintain the lawn and property. A marketing report detailing any and all activity from potential clients will be provided to Founders Bank on a monthly basis by the Debtor. Funds from the sale of assets will be used by the reorganized Debtor to complete any or all incomplete construction items. Any amounts that are unadvanced under the construction note held by the Debtor will be deducted from the principal amount of the note owed by the Debtor securing said property. Completed construction under the Debtor's supervision will be the most likely return of profit to the Estate after sale of said property. As of the date of this plan submittal, (May 2, 2010) the amounts remaining unadvanced under the note securing said property are approximately $8,700.00.


      8410 Den Oak- Whispering Oaks Subdivision


      The Debtor shall retain its interest in the property located at 8410 Den Oak as identified in the Amended Schedule A- Real Property, for a period of 6 months after the Effective Date with the intent to market and sell said property with a real estate broker. Upon the expiration of the 6 month period and the failure by the Debtor to contract or sell the property, the Debtor shall surrender and abandon to Founders Bank any and all

interests in full and final satisfaction of Founders Bank's claim in the property as identified in the Amended Schedule D- Creditors Holding Secured Claims. Debtor agrees to pay post-petition interest through the sale of said property, at a note rate of 6%, from the date of the filing of its petition (November 3, 2009) through confirmation of the Plan or date of sale of said property, whichever event occurs sooner. Debtor agrees to maintain insurance coverage on the property, maintain all utilities and maintain the lawn and property. A marketing report detailing any and all activity from potential clients will be provided to Founders Bank on a monthly basis by the Debtor. Funds from the sale of assets will be used by the reorganized Debtor to complete any and all incomplete construction items. Any amounts that are unadvanced under the construction note held by the Debtor will be deducted from the principal amount of the note owed by the Debtor securing said property. Completed construction under the Debtor's supervision will be the most likely return of profit to the Estate after sale of said property. As of the date of this Plan submittal (May 2, 2010) the amounts remaining unadvanced under the note securing said property are $25,694.00.

### Class 7 -Secured Claim of First Community Bank, NA.

Impaired-   3711 Tierra Amarilla- Lakes of Mission Grove Subdivision

The Debtor shall retain its interest in the property located at 3711 Tierra Amarilla as identified in the Amended Schedule A- Real Property, for a period of 6 months after the Effective Date with the intent to market and sell said property with a real estate broker. Upon the expiration of the 6 month period and the failure by the Debtor to contract or sell the property, the Debtor shall surrender and abandon to First Community Bank any and all interests in full and final satisfaction of First Community Bank's claim in the property as identified in the Amended Schedule D- Creditors Holding Secured Claims. Debtor agrees to pay post-petition interest through the sale of said property, at a note rate of 6%, from the date of the filing of its petition(November 3, 2009) through the confirmation of the Plan or the date of sale of said property, whichever event occurs sooner. Ad valorem taxes if any, will be paid upon the sale of said property. Debtor agrees to provide insurance coverage on the property, maintain all utilities and maintain the property. A marketing report detailing any and all activity from potential clients will be provided to First Community Bank on a monthly basis by the Debtor.

### Class 8- Secured Claim of First Community Bank, NA.

Impaired-    Lot Fifteen (15) Block One (1) of the Grand Reserve- River Forest Estates, Section One (1)

The Debtor shall retain its interest in the property located at Lot 15 Block 1 Section 1 of the Grand Reserve, as identified in the Amended Schedule A- Real Property, for a period of 6 months after the Effective Date with the intent to market and sell said property with a real estate broker. Upon the expiration of the 6 month period and the failure by the Debtor to contract or sell the property, the Debtor shall surrender and abandon to First Community Bank any and all interests in full and final satisfaction of First Community Bank's claim in the property as identified in the Amended Schedule D- Creditors Holding Secured Claims. Debtor agrees to pay post-petition interest through the sale of said property, at a note rate of 6%, from the date of the filing of its petition

11

(November 3, 2009) through the confirmation of the Plan or the date of sale of said property, whichever event occurs sooner. Ad valorem taxes if any, will be paid upon the sale of said property. Debtor agrees to maintain the property. A marketing report detailing any and all activity from potential clients will be provided to First Community Bank on a monthly basis by the Debtor.

Lot Sixteen (16) Block One (1) of the Grand Reserve- River Forest Estates, Section  One (1)

The Debtor shall retain its interest in the property located at Lot 16  Block 1 Section 1 of the Grand Reserve, as identified in the Amended Schedule A- Real Property, for a period of 6 months after the Effective Date with the intent to market and sell said property with a real estate broker. Upon the expiration of the 6 month period and the failure by the Debtor to contract or sell the property as identified in the Amended Schedule D- Creditors Holding Secured Claims. Debtor agrees to pay post-petition interest through the sale of said property, at a note rate of 6%, from the date of the filing of its petition (November 3, 2009) through confirmation of the Plan or the date of sale of said property, whichever occurs sooner. Ad valorem taxes if any, will be paid upon the sale of said property. Debtor agrees to maintain the property. A marketing report detailing any and all activity from potential clients will be provided to First Community Bank on a monthly basis by the Debtor.

## Class 9 -Secured Claim of First Community Bank NA.

Impaired-    8418 Den Oak- Whispering Oaks Subdivision

The debtor shall retain its interest in the property located at 8418 Den Oak as identified in the Amended Schedule A- Real Property, for a period of 6 months after the Effective Date with the intent to market and sell said property with a real estate broker. Upon the expiration of the 6 month period and the failure by the Debtor to contract or sell the property, the Debtor shall surrender and abandon to First Community Bank any and all interests in full and final satisfaction of First Community Bank's claim in the property as identified in the Amended Schedule D- Creditors Holding Secured Claims. Debtor agrees to pay post-petition interest through the sale of the property, at a note rate of 6 %, from the date of the filing of its petition (November 3, 2009) through confirmation of its Plan or sale of said property whichever event occurs sooner.  Ad valorem taxes if any, shall be paid by the Debtor upon sale of said property. The Debtor agrees to maintain insurance coverage on the property, maintain all utilities and maintain the lawn and property. Debtor will provide a written marketing report to First Community Bank detailing its efforts and any and all prospective clients for the property on a monthly basis by the Debtor. Funds from the sale of assets will be used by the reorganized Debtor to complete any and all incomplete items of construction. Any amounts that are unadvanced under the construction note held by the Debtor, will be deducted from the principal amount of the note owed by the Debtor securing said property. Completed construction under the Debtor's supervision will be the most likely return of profit to the Estate after the sale of said property. As of the date of this Plan submittal the amounts remaining unadvanced under the note securing said property are $96,000.00.

**Class 10- Secured Claim of First Community Bank NA.**

Impaired-        2618 Forest View Dr. – River Forest Estates

The Debtor shall retain its interest in the property located at 2618 Forest View Dr., as identified in the Amended Schedule A- Real Property, for a period of 12 months after the Effective Date with the intent to market and sell said property with a real estate broker. Upon the expiration of the 12 month period and the failure by the Debtor to contract or sell the property, the Debtor shall surrender and abandon to First Community Bank any and all interests in full and final satisfaction of First Community Bank's claim in the property as identified in the Amended Schedule D- Creditors Holding Secured Claims. Debtor agrees to pay post-petition interest through the sale of the property, at a note rate of 6 % from the date of the filing of its petition (November 3, 2009) through confirmation of the Plan or sale of said property, whichever occurs sooner.  Ad valorem taxes if any, shall be paid upon the sale of the property by the Debtor. Debtor agrees to provide all of the following at its expense: insurance coverage for the property, property maintenance, pool and fountain maintenance, well maintenance, septic system maintenance, irrigation system maintenance, electric gate and fence maintenance, all utilities and security to the property.  Debtor will provide First Community Bank with a detailed outline of specialty marketing events that have been planned in conjunction with the sale of the property as well as a list of all currently placed ads in marketing publications. Debtor agrees to provide First Community Bank with a list of all prospective clients that have qualified through a licensed real estate representative on a monthly basis.

**Class 11- M&M Secured Claims.**  Class 11 is impaired.  To the extent funds are available, Class 11 claims will be paid from the sale of that specific property to which said claim is attached. In the event a deficiency remains from a Class 11 claim, such deficiency shall become an allowed Class 12 claim. Those creditors and the properties in which they have perfected security interest are listed in the attached "Exhibit C".

**Class 12- General Unsecured Creditors.**  Class 12 is impaired. Allowed Class 12 Claims will be paid their pro-rata share of the proceeds received from the sale of assets after payment of all Allowed Administrative Claims, Allowed Priority Claims and Allowed Secured Claims. The estimated amount of claims in this class based upon proofs of claim and Debtor's schedules is $1,030,925.70 . The pro-rata amount is determined by dividing the allowed claim of a creditor's claim by the total amount of all allowed claims out of the total sum of 95% of the sales of the sale(s) of real property after the Effective Date. Debtor shall make a distribution to Class 12 claims within 30 days after the sale of each of the Estate's real property.  Assuming the Debtor retains and sells all properties at current listed price, this would generate gross proceeds in excess of $9,000,000. This amount of proceeds would potentially yield enough to pay all unsecured creditors in full. This amount would be reduced if properties are not retained in their entirety or in part by the Debtor and sold through the reorganization Plan. This amount could also be reduced by the sales price taken by the Debtor that it believes would be in the best interest of the Estate. The creditors in this class are listed in the attached "Exhibit D".

**Class 13 - Equity Interest Holders.**  Class 13 consists of the shareholders of the Debtor's Estate, Darren Hall and Rochelle Hall. Class 13 shareholders shall retain their equity interest in the Reorganized Debtor, but shall not receive any distributions from the

13

Reorganized Debtor unless all Allowed Claims have been paid in full.

**3.02 Retention of Jurisdiction**.  Notwithstanding confirmation of the Plan, the Bankruptcy Court shall retain the exclusive jurisdiction over the Reorganization Case for the following purposes:

(a) to determine any and all objections to the allowance of Claims and Equity Security Interests;

(b) to determine any and all pending applications for the rejection or assumption of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear and determine, and if necessary to liquidate, any and all Claims arising therefrom;

(c) to determine any and all applications, adversary proceedings and contested or litigated matters that may be pending on the Effective Date, or instituted by the Debtor after the Effective Date, including, without limitation, any Claims arising under the Bankruptcy Code to avoid any preferences, fraudulent conveyances or other voidable transfers;

(d) to consider any modifications of the Plan, any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, Including, without limitation, the Confirmation order;

(e) to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or the execution and delivery of a Plan Exhibit;

(f) to issue such orders in aid of execution of the Plan to the extent authorized by Section 1142 of the Bankruptcy Code;

(g) to determine such other matters which may be set forth in the Confirmation order or which may arise in connection with the Plan or the Confirmation order; and

(h) to determine any and all pre-confirmation applications for allowances of compensation, entitled to priority under §507(a)(1) of the Code, and reimbursement of expenses and any other pre-confirmation fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan.

**3.03 Discharge of Debtor**.  Except as otherwise provided herein, upon the Effective Date all claims against the Debtor shall be satisfied.  All entities shall be precluded from asserting against the Debtor, its respective successors or its assets or properties any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation date.

**3.04 Title to Assets**: Discharge of Liabilities.  Except as otherwise provided in the Plan, on the Effective Date, title to all assets and properties dealt with by the Plan shall

vest in the Reorganized Debtor, in accordance with Section 1141 of the Bankruptcy Code, free and clear of all liens, claims and encumbrances; and the Confirmation order shall be a judicial determination of the liabilities of the Debtor, except as provided in the Plan.

**3.05 Forfeiture**.  The Debtor shall make distributions to Creditors at the addresses set forth on the Proofs of Claim filed by such Creditors or at their last-known addresses if no Proof of Claim is filed or if the Debtor has been notified of a change of address.  If any Creditor's distributions are retuned as undeliverable, no further distributions to such Creditor shall be made unless and until notification is received of such Creditor's then current address, at which time, all missed distributions shall be made to such Creditor, without interest.  The Debtor shall be under no obligation to locate or contact any Creditor.  All Claims for undeliverable distributions shall be made on or before the second anniversary of the Confirmation Date.  Until such time, undeliverable distributions shall be retained in an interest-bearing account.  After such date, all unclaimed payments shall be disbursed to any remaining Allowed Claims and the Claim of any Creditor with respect to such payments shall be discharged and forever barred.

**3.06 Bar Dates for Filing Proofs of Claim**.  The Debtor has filed as a part of its schedules a list of all creditors, setting forth the identity of each such creditor and an indication of the amount due each such creditor.  Unless a claim is listed as disputed, contingent or unliquidated, each creditor's claim will be allowed in the amount and status stated on their schedules in absence of filing of a proof of claim in a different amount or status on or before the expiration of 90 days from the date first set for meeting of the creditors.  Claims listed as disputed, contingent, or unliquidated will not be allowed unless a proof of claim with all supporting documents is filed prior to the expiration of 90 days from the first meeting of creditors.  In the event a creditor has filed a proof of claim in these proceedings with which the Debtor disagrees, the Debtor shall file an objection to said claim as designated in the Post Confirmation Certificate.

Any proof of claim which is not timely filed shall be of no force and effect. No distribution will be made to any creditor that has not timely complied with this provision.

## IV.
## CONFIRMATION PROCEDURES AND STANDARDS

In order for the Plan to be confirmed, various statutory conditions must be satisfied, including (i) a finding by the Court that the Plan is feasible, (ii) the acceptance of the Plan by at least one impaired class entitled to vote on the Plan, not counting insiders, and (iii) provision for payment or distribution to each claimant under the Plan of money and/or other property equal in value to at least what the claimant would have received in liquidaton or, with respect to each Class, either acceptance by the Class or a finding by the Court that the Plan is "fair and equitable" and does not "discriminate unfairly" against the Class.

**4.01 Who May Vote**.  Distributed along with this Disclosure Statement is a ballot on which Creditors and interest holders can vote to accept or reject the Plan.  Only classes that are impaired under the plan are entitled to vote on acceptance or rejection of the Plan.  Generally, section 1124 of the Bankruptcy Code provides that a class of claims or

interests is considered impaired unless a plan does not alter the legal, equitable, and contractual rights of the holder of the claim or interest. In addition, these classes are impaired unless all outstanding defaults, other than defaults relating to the insolvency or financial condition of the debtor or the commencement to the Chapter 11 case, have been cured and the holders of the claims or interests in these classes have been compensated for any damages incurred as a result of any reasonable reliance or any contractual provision or applicable law to demand accelerated payments.

Any claim that is subject to an unresolved objection may not vote unless an order is obtained from the Court temporarily allowing the Claim for the purpose of voting. Any party in interest may object to a Claim.

Classes not impaired under the Plan, pursuant to section 1126(f) of the Bankruptcy Code, are deemed to have accepted the Plan without voting. All impaired classes under the Plan are entitled to vote to accept or reject the Plan.

**4.02 Confirmation of the Plan**. Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

(a) Confirmation Hearing. Section 1128(a) of the Bankruptcy Code requires the Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). The Court will schedule the Confirmation Hearing, set deadlines and require notice to all creditors. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of the Plan, regardless of whether it is entitled to vote.

(b) Objections to Confirmation. The Court will schedule a hearing to consider objections by parties in interest to confirmation of the Plan. **THE HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT MADE AT THE HEARING**. While the Plan Proponent expects that any hearing to consider objections to the confirmation of the Plan will be held in conjunction with the Confirmation Hearing, there can be no assurance that such will be the case. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY MADE IT MAY NOT BE CONSIDERED BY THE COURT**.

**4.03 Requirements for Confirmation of the Plan**. At the Confirmation Hearing, the Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Court will enter an order confirming the Plan. These requirements are as follows:

**(a) Feasibility of the Plan**. In order for the Plan to be confirmed, the Court must determine that a further reorganization or subsequent liquidation of the Debtor is not likely to result following confirmation of the Plan. The Plan Proponent believes that the Plan is feasible. All payments under the Plan are to be made out of assets already on hand (i.e., inventory and receivables) or reasonably anticipated from continued operation of the Property.

**(b) Best Interest Test**.  With respect to each impaired class contemplated by Section 1129(a)(7)(A), each member must either (a) accept the Plan or (b) receive or retain under the Plan, on account of its Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount the holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To determine what the holder in each impaired class of Claims and Interests would receive if the Debtor were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of that Proponent's assets and properties in a context of a Chapter 7 liquidation case.  The cash amount that would be available would consist of the proceeds resulting from the disposition of the assets of the Debtor, reduced by the costs and expenses of the liquidation and by such additional administration and priority expenses that may result from the termination of the Debtor's business and use of Chapter 7 for the purposes of liquidation.

The costs of liquidation under Chapter 7 would include the fees payable to the trustee appointed in the Chapter 7 case, as well as those that might be payable to additional attorneys and other professionals that the trustee might engage.  Costs of liquidation would also include any unpaid expenses incurred by the Debtor during the Chapter 11 case, such as compensation for attorneys, financial advisors, and accountants and costs and expenses of any committed, that are allowed in the Chapter 11 Case.  In addition, Claims may arise by reason of the breach of or rejection of obligations incurred and executory contracts entered into by the Debtor during the pendency of the Chapter 11 case.

To determine if the Plan is in the best interest of each impaired class, the present value of the distribution from the proceeds of the liquidation of the Proponent's assets and properties (after subtracting the amounts attributable to the claims described above) are then compared with the present value offered to each of the cases of Allowed Claims and Allowed Interests under the Plan.

In applying the "best interest" test, it is necessary to consider that Claims and Interests in a Chapter 7 case might not be classified in the same manner as provided in the Plan.  In the absence of a contrary determination by the Bankruptcy Court, all allowed unsecured claims which have the same rights upon liquidation would be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from a Chapter 7 case of the Proponent.  The distribution of the liquidation proceeds would be calculated pro rata according to the amount of the allowed unsecured claim held by each Creditor in the class.  The Plan Proponent believes that the most likely outcome of a  liquidation proceeding under Chapter 7 would be the application of the rule of absolute priority of distributions.  Under that rule, no junior class of Creditors would receive any distribution until all senior classes of Creditors were paid in full with interest, and no Interest Holder would receive any distribution until all Creditors were paid in full with interest.  Consequently, the Plan Proponent believes that in any Chapter 7 case, holders of Claims in all of the Classes would receive less than under the Plan.

In this case, a Chapter 7 liquidation would likely result in significant loss of estate value due to the administrative expenses and delay caused by a Chapter 7 liquidation.

This Chapter 11 plan is the most expedient and least costly method of distribution payments to creditors. Since a Chapter 7 Trustee would be unfamiliar with the facts pertaining to this case, the Trustee would be forced to spend significant time in processing this case and liquidating all assets before any distribution can be made to creditors. In addition, a Chapter 7 Trustee would bring an additional level of administrative expenses thereby further reducing the funds available for distribution to creditors. Confirmation of this Chapter 11 reorganization plan will maximize distribution to creditors and shorten the time for distribution.

(c) **Acceptance by Impaired Classes**. Section (a)(8) of the Bankruptcy Code requires that, subject to the "cram-down" exception contained in section 1129(b), each impaired class must accept the Plan by the requisite vote for confirmation to occur. A class of impaired claims will have accepted the Plan if at least two-thirds in amount and more than one-half in number of Allowed Claims in the class voting to accept or reject the Plan have voted in favor of acceptance. In addition, regardless of whether recourse is had to the cram-down provisions of section 1129(b), at least one impaired class must accept the Plan, without counting the votes of any "insiders" contained in the class, as defined in Section 101(2) of the Bankruptcy Code.

(d) **Cram-down**. If any impaired class of claims or interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Proponent pursuant to the cram-down provisions of Section 1129(b) if, as to such impaired class, the Plan "does not discriminate unfairly" and is "fair and equitable" with respects to that class. A Plan does not discriminate unfairly if no class receives more that it is legally entitled to receive for its claims or equity interests. "Fair and equitable" has different meanings for secured claims, unsecured claims and interests.

With respect to a secured claim, "fair and equitable means that either (i) the impaired secured creditor retains its liens to the extent of its allowed secured claims and receives deferred cash payments equal to the allowed amount of its claim with a present value as of the Effective Date of the Plan at least equal to the value of the creditor's interest in the property securing its liens, (ii) property subject to the lien of an impaired secured creditor is sold free and clear of the lien, with the lien attaching to the proceeds of the sale, or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the Plan. With respect to an unsecured claim, "fair and equitable" means that either (i) each impaired unsecured creditor receives or retains property of a value equal to the amount of its Allowed Claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the Plan.

With respect to an interest "fair and equitable" means that either (i) each holder of an impaired interesting the class receives or retains property of a value equal to the greatest of the allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of that interest or (ii) the holders of all interests that are junior to the interest of the dissenting class will not receive any property under the Plan.

The Bankruptcy Court must determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any impaired class of Claims of Interests. The Plan Proponent believes that each holder of a Claim impaired

under the Plan will receive payments under the Plan having a present value as of the Effective Date an amount not less than the amount likely to be received if the Debtor were liquidated in a case under Chapter 7 of the Bankruptcy Code. The Plan Proponent believes that the likely distribution to creditors though a Chapter 7 liquidation would be substantially less than as proposed under this Plan. At the Confirmation Hearing, the Bankruptcy Court will determine whether Creditors would receive greater distributions in a liquidation under Chapter 7 than they would under the Plan.

### 4.04 Voting Procedures

(a) **Counting Votes**.  In order to be counted, a ballot must be **RECEIVED** at the following address no later than the date set by the Bankruptcy Court.

> United States Bankruptcy Court
> District Clerk's Office
> 515 Rusk St.
> Houston, Texas 77002

> Jack N. Fuerst
> Jack N. Fuerst & Associates, P.C.
> 8955 Katy Freeway, suite 205
> Houston, Texas 77024

The Plan Proponent will tabulate the votes.

(b) Solicitation of Votes.  The ballot included herewith will serve as the ballot for indicating acceptance of the Plan pursuant to the requirements of Section 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 301(c).  Section 1125(b) of the Bankruptcy Code and Bankruptcy Rule 3018 govern the solicitation and the binding effect of acceptances.  Any holder of a contested Claim may ask the Bankruptcy Court, pursuant to Bankruptcy Rule 3018, to have its Claim or Interest allowed for the purpose of accepting or rejecting the Plan.

## V.
## SOURCE OF INFORMATION FOR THIS DISCLOSURE STATEMENT

The information contained herein has not been subject to a certified audit.  Most of the information, descriptions, values and facts contained herein are derived from in house accounting staff, management of the Debtor, and unverified options of third parities.  Accordingly, the Debtor does not warrant or represent that the information contained herein is correct, although great effort has been made to be accurate.  This Disclosure Statement does not contain the Plan in its entirety, the Plan itself which is controlling in the event of any inconsistencies.  Each creditor is urged to review the Plan prior to voting.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein and the delivery of this Disclosure Statement shall not under any circumstances create an implication that there has not been

any change in the facts as set forth herein since the date hereof. All the terms herein have the same meanings as in the Plan unless the context requires otherwise.

**VI.**
**PROFESSIONAL FEES**

Upon filing the Debtor's Chapter 11 case, the law firm of Jack N. Fuerst & Associates, P.C. was engaged on a general retainer to represent the Debtor. . Debtor's legal fees and expenses owing to Jack N. Fuerst & Associates, P.C. as of April 30, 2010 are $ 16,836.00, which fees are subject to approval by the Bankruptcy Court. Jack N. Fuerst & Associates, P.C. was paid a retainer in the amount of $3,000.00. No accounting firms are engaged by the Debtor to assist in finalizing the Debtor's financial records and operating reports. Thus, no accounting fees are owed as of April 30, 2010 which are subject to the approval of the Bankruptcy Court.

**VII.**
**PENDING LITIGATION**

**7.01 General**

Other than collection activities and objections to claims, the Debtor does not anticipate pursuing any litigation post-petition.

**7.02 Fraudulent and Preferential Transfers**

Debtor is aware of approximately 200 payments to third parties in the 90 days preceding the filing of Bankruptcy. These payments appear to all be for ongoing obligations of the Debtor incurred in the ordinary course of business, but a full analysis has not been completed to determine potential preferences. However, Debtor is unaware of any preferential payments to insiders within the year preceding the bankruptcy filing.

Any avoidance power actions will be retained by the Reorganized Debtor under the Plan. The Reorganized Debtor will be given the exclusive right to enforce any and all causes of action owned by the Debtor, including any causes of action which may exist under the Bankruptcy Code or state law. Any recoveries made from Avoidance Actions will be distributed to creditors provided under the Plan.

**VIII.**
**ALTERNATIVES TO THE PLAN PROPOSED**

The Debtor expects the Plan will enable it to realize the most benefits for all of its

20

creditors.  However, if the Plan is not confirmed, the Debtor may continue to seek other avenues for Reorganization.

**CONVERSION**:  In the event no suitable alternative could be found, the Debtor would be compelled, as well as obligated, to recommend the conversion of the Chapter 11 case to a case under Chapter 7, and a subsequent liquidation by a duly appointed or elected Chapter 7 trustee.  Although the Debtor is of the opinion that a straight liquidation of the assets would not be in the best interests of the creditors generally, the following is likely to occur:

(a)  The newly appointed Chapter 7 trustee would have to become familiar with the Debtor's operations in order to evaluate all the Debtor's assets and liabilities, including the numerous claims which are the subject of the pre-petition litigation and all transactions which will serve as a basis for future litigation;

(b)  In addition to the duplication of efforts that would transpire as a result of the Chapter 7 trustee having to review documents and interview persons in order to become sufficiently acquainted with Debtor's business, the Chapter 7 trustee would likely retain professionals to aid in administering the estate;

(c)  An additional tier of administrative expenses entitled to priority over general unsecured claims would be incurred.  Such administrative expenses would include Chapter 7 trustee's commissions and fees for the professionals likely to be retained; and

(d)  There would likely be no distribution at all to the creditors until the case was ready to be closed.  The Debtor will allow the creditors and parties-in-interest to draw their own conclusions with respect to the detriment to them due to delay in administration by a Chapter 7 Trustee.  It is certain that the able factors would result in an additional dilution to the projected dividend.  The Debtor believes that such a speculative projection should be made by the creditors themselves.

The Debtor believes if the assets of the Debtor were liquidated through a Chapter 7 trustee there would be a greatly reduced dividend to the unsecured creditors, as opposed to the Debtor's Plan which could result in a significant payment to unsecured creditors.

Dismissal of the proceeding would, in the judgment of the Debtor, lead to an unsatisfactory result.  Dismissal would result in numerous lawsuits to collect debts which would cause the Debtor to incur more expenses in the form of attorney's fees, etc.

The Debtor has attempted to set forth possible alternatives to the proposed Plan. Accordingly, one should recognize that a vote against the Plan and the ultimate rejections of the Plan would not alter the present status of the Debtor.  The vote on the plan does not include a vote on alternatives to the Plan.  There is no assurance what turn the proceedings will take if the Plan is rejected.  IF you believe one of the alternatives referred to above is preferable to the Plan and you wish to urge upon the Court, you should consult your Counsel.

**IX.**

21

## FEDERAL INCOME TAX CONSEQUENCES

**(a) CREDITORS**: The Debtor believers that the following discussion generally sets forth the Federal Income Tax consequences to Creditors upon confirmation and consummation of the Plan. No ruling has been sought or obtained by the Debtor from the Internal Revenue Service ("IRS") with respect to any of these matters. The following discussion of Federal Income Tax consequences is not binding on the IRS and is general in nature. No statement can be made herein with respect to the particular Federal Income Tax consequences to any Creditor.

**AS A RESULT OF THE COMPLEXITY OF THE APPLICABLE PROVISIONS OF THE INTERNAL REVENUE CODE, EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR IN ORDER TO ASCERTAIN THE ACTUAL TAX CONSEQUENCES TO IT, UNDER FEDERAL AND APPLICABLE STATE AND LOCAL LAWS, OF CONFIRMATION AND CONSUMMATION OF THE PLAN.**

Creditors may be taxed on distributions they receive from the Estate. The amount of the income or gain, and its character as ordinary income or capital gains or loss, as the case may be, will depend upon the nature of the Claim of each particular Creditor. The method of accounting utilized by a Creditor for Federal Income Tax purposes may also affect the tax consequences of a distribution. In general, the amount of gain (or loss) recognized by any such Creditor distributions, will be the difference between (i) the Creditor's basis for Federal Income Tax purposes, if any, in the Claim and (ii) the amount of the distribution received. Whether the distribution will generate ordinary income or capital gains will depend upon whether the distribution is in the payment of a Claim or item which would otherwise generate ordinary income on the one hand or payment of a Claim which would constitute a return on capital.

**(b) DEBTOR TAX CONSEQUENCES**: The Debtor has significant net operating losses to carry forward. Normally, NOLs can be used to offset ordinary operating income on a dollar for dollar basis. To the extent, however, that Claims are not paid and debts are forgiven as a result of this Plan, the Debtor would have to reduce its NOLs one dollar for each dollar of debt discharged under the Plan. Therefore, the actual amount of taxes which may be owed is too speculative for Debtor to be able to project. Therefore, the Debtor's tax consequences should be minimal.

## X.
## MODIFICATION OF DISCLOSURE STATEMENT

The Debtor may propose amendments to or modification of this Disclosure Statement at any time prior to the confirmation with leave of the Court. After confirmation, the proponent may, with the approval of the Court, so long as it does not materially or adversely affect the interests of the creditors or other parties-in-interest as set forth herein, remedy any defect or ommission, reconcile any inconsistencies in this Disclosure Statement, or in the Order Confirming Disclosure Statement, in such a manner as may be necessary to carry out the purposes and intent of this Disclosure Statement.

## XI.
## OTHER BANKRUPTCIES

The Debtor has not filed a prior bankruptcy proceeding.


## XII.
## CONCLUSION

The Debtor believes that approval of its Plan will provide an opportunity for creditors to receive more through the proposed Plan on account of their claims than would be received in a straight liquidation by a trustee in a Chapter 7 case or from a distress sale of all the assets. If the Plan is not approved, the Debtor will continue to seek other reorganization alternatives, but liquidation might ensue, with the consequences as discussed above in relation to the liquidation alternative.

This Disclosure Statement is subject to the approval by the Bankruptcy Court after notice and hearing.

**THE APPROVAL BY THE UNITED STATES BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE DEBTOR'S PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

The Plan of Reorganization contains additional provisions and each creditor should review the provision of the Plan with Particularity.


Respectfully submitted this 2nd day of May , 2010.

Texas Classic Builders, LP.

By: _____
Darren Hall, President


**Jack N. Fuerst & Associates, P.C.**

By: _____
Jack N. Fuerst

23

TBN: 07499500
8955 Katy Freeway, Suite 205
Houston, Texas 77024
(713) 299-8221 (Telephone)
(713) 789-2606 (Telecopier)

jfuerst@sbcglobal.net

## Exhibit "A"

A-1.   The amount of the proceeds of sale from each of the houses that Debtor has sold during this case.

| | |
|---|---|
| 3615 Stone Crest Court, Richmond, Texas 77406 | $545,000.00 |
| 2415 Creektrail Lane, Richmond, Texas 77406 | $530,707.00 |

A-2.   The amount of each payment made to pay the secured claims on each of the houses the Debtor has sold during this case.

| | |
|---|---|
| 3615 Stone Crest Court, Richmond, Texas 77406 | $497,752.28 |
| 2415 Creektrail Lane, Richmond, Texas 77406 | $441,105.96 |

A-3.   The amount of brokerage and/or realtor fees and commissions, and closing costs paid on each of the houses that Debtor has sold during this case.

| | |
|---|---|
| 3615 Stone Crest Court, Richmond, Texas 77406 | $32,700.00 |
| 2415 Creektrail Lane, Richmond, Texas 77406 | $30,258.18 |

A-4.   The net proceeds of sale-after deduction of the amounts set forth in subparagraphs 2 and 3 above-that were generated from each of the houses that Debtor has sold during this case; and located in the Debtor's attorney's Trust Account.

| | |
|---|---|
| 3615 Stone Crest Court, Richmond, Texas 77406 | None |
| 2415 Creektrail Lane, Richmond, Texas 77406 | $10,000.00 |

A-5.   The amount of funds that Debtor has borrowed during this case, the identity of the lender in regard to any such borrowed funds, and the security for each such loan.

The Debtor has not borrowed any funds during this case.

A-6.   The amount of each pre- or post-petition trade or mechanics/materialmen's lien creditor claim incurred during the pendency of this case, the identity of the holder of each such claim, and the house on which each such claim was incurred.

No Pre or post-petition trade or mechanics/materialmen's lien creditor claims have been made during the pendency of this case by the Debtor

A-7.   The amount of each pre- or post-petition trade or mechanics/materialmen's lien creditor claim paid during the pendency of this case, the date of such payment, the identity of such holder of each such claim, and the house on which each such claim was incurred.

No Pre or post-petition trade or mechanics/materialmen's lien creditor claims have

1

been made during the pendency of this case by the Debtor.

## Exhibit "B"

1.     Legal fess of Debtor's attorney Jack N. Fuerst as of May 2, 2010:  $16,836.00

2.     TCVI payment of Debtor's 2009 State Franchise Tax :          $3,909.70

                                                                                                             Total:  $20,777.00

1

EXHIBIT "C"   SECURED M&M LIEN AMOUNTS

| | M&M<br>LIEN AMOUNT | PROPERTY<br>SECURING LIEN |
|---|---|---|
| 24/7 Plumbing | 6,850.00<br>5,833.34<br>3,300.00 | 8418 Den Oak<br>8410 Silent Cedar<br>502 Leaning Oak |
| ABC Supply | 12,434.65 | 8418 Den Oak |
| AABC/KIVA | 47,898.92 | 2618 Forest View |
| BISON | 8,657.30<br>17,712.02<br>21,323.88 | 8418 Den Oak<br>8410 Silent Cedar<br>8410 Den Oak |
| CIRCLE SUPPLY | 6,291.88 | 8410 Den Oak |
| D&E PLUMBING | 31,412.00 | 2618 Forest View |
| EARTHCORE LLC | 2,175.82 | 2618 Forest View |
| FIRST SOURCE<br>ELECTRIC | 7,791.83 | 8410 Den oak |
| FLOORING SYSTEMS | 3,209.29<br>6,244.29 | 3515 West Elm<br>3711 Tierra Amarilla |
| HAUSLER'S PAINT | 12,116.59 | 2618 Forest View |
| HODGES READY<br>MIX | 16,198.88 | 8410 Den Oak |
| HMJ TILE | 10,046.00<br>4,855.50 | 8410 Den Oak<br>502  Leaning Oak |
| Lighting Inc. | 3,583.16 | 2618 Forest View |
| MASCO | 2,885.00<br>1,388.00 | 8410 Den Oak<br>8410 Silent Cedar |
| Perfection<br>Fireplace | 3,200.00<br>5,065.00<br>3,250.00 | 8410 Silent Cedar<br>8418 Den Oak<br>8410 Den Oak |

| | | |
|---|---|---|
| PRO BUILD SOUTH | 36,891.08 | 8418 Den Oak |
| | 2,456.73 | 3515 West Elm |
| Q&H CASTSTONE | 12,312.50 | 2618 Forest View |
| RIVER FOREST LTD. | 160,000.00 | 3515 West Elm |
| SCHOLL FOREST LUMBER | 6,639.19 | 8410 Sijent Cedar |
| | 24,980.18 | 8410 Den Oak |
| SPRINT SAND | 4,500.00 | 8418 Den Oak |
| STILLO CONSTRUCTION | 15,000.00 | 8410 Den Oak |
| STOCK BUILDING SUPPLY | 4,144.91 | 502 Leaning Oak |
| WALLBOARD STOCKERS | 5,040.34 | 8418 Den Oak |
| | 5,332.37 | 8410 Den Oak |
| | 4,948.49 | 8410 Silent Cedar |
| WHITNEY'S CUSTOM | 3,534.37 | 8410 Den Oak |
| WILLAIMS/MASCO | 2,885.00 | 8410 Den Oak |

## LIEN AMOUNTS

| | |
|---|---|
| TOTAL | 532388.51 |

EXHIBIT "D" UNSECURED   CREDITORS

**UNSECURED**
**AMOUNT**

| | |
|---|---|
| 24/7 Plumbing | 14,136.68 |
| ABC Supply | 14,998.37 |
| American Express | 85,196.85 |
| American Express | 82,880.71 |
| All About Landscaping | 4,675.08 |
| AMERICAN ARBITRATION | 425 |
| APACHE FENCE | 40,026 |
| B&B FLOORING | 14,173.25 |
| BANK OF AMERICA | 10,817.80 |
| BISON | 20,472.40 |
| CAPITAL ONE | 10,388.86 |
| CY CREEK GRANITE | 12,224.70 |
| DAL-TILE | 6,359.66 |
| HMJ TILE | 19,839.25 |
| HURTS WASTEWATER | 4,300 |
| HSIESH, JIM CPA | 20,000.00 |
| IRS | 894 |
| INVISION POOLS | 49,500.00 |

| | |
|---|---|
| KEYSTONE | 47,810.67 |
| LAKES OF MISSION GROVE HOA | 2,660.96 |
| LANDSCAPE CONCEPTS | 9,500.00 |
| Lighting Inc. | |
| M&F DRYWALL | 21,500.00 |
| Mark III | 10,172.52 |
| MASCO | 8,587.05 |
| Marme Inc. | 13,956.23 |
| Mission Grove LP | 72,890.00 |
| Pedico Stucco | 16,200.00 |
| Perfection Fireplace | 3,497.90 |
| PPG PAINT | 5,722.39 |
| PRO BUILD SOUTH | 34,264.82 |
| SEALY CONCRETE | 79,223.98 |
| SEYBRO DOOR | 11,490.00 |
| SPRINT SAND | 3,487.00 |
| STOCK BUILDING SUPPLY | 23,911.35 |
| STONE PAVILLION | 6,107.57 |
| STAR WINDOWS | 14,500.00 |
| STUCCO STONEHILL | 9,950.00 |
| TCVI | 155,049.66 |
| THOMAS CLASSIC | 16,946.52 |

| | |
|---|---|
| TOWN&COUNTRY BRICK | 9,016.30 |
| WADLER/PERCHES | 10,236.42 |
| WALLBOARD STOCKERS | 5,938.45 |
| WAYNE DALTON | 3,490.00 |
| WALKER ZANGER TILE | 14,720.35 |
| WHITNEY'S CUSTOM | 8,786.95 |

**UNSECURED**

| | |
|---|---|
| **TOTAL** | 1030925.7 |